IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

STACY BURKE,

    Plaintiff,

v.                                                       CASE NO. 5:16cv90-RH/CAS

MEGAN J. BRENNAN, in her
official capacity as POSTMASTER
GENERAL,

    Defendant.

_____/

## ORDER FOR ENTRY OF JUDGMENT

This is a union grievance masquerading as a Title VII case. At a jury trial, after the plaintiff rested, the defendant's motion for judgment as a matter of law was granted. This order confirms the ruling and directs the clerk to enter judgment.

I

The plaintiff Stacy Burke was and still is an employee of the United States Postal Service in Panama City, Florida. The defendant is the Postmaster General—the proper defendant in a postal employee's Title VII case.

Case No. 5:16cv90-RH/GRJ

Ms. Burke asserted in her complaint that she suffered discrimination because she is white. In her amended complaint she changed tack, asserting she suffered discrimination because she is "Native American Indian." Am. Compl., ECF No. 20 at 2. This order uses the shorter phrase "American Indian." American Indian is of course a protected characteristic under Title VII. This order refers to the characteristic as a race.

At trial Ms. Burke said she never intended to claim discrimination on the ground that she is white. She said the complaint's contrary assertion was simply a mistake. She attributed the mistake to her attorney. The mistake was perhaps understandable because a person observing Ms. Burke would have no reason to believe her race is anything other than white. Discrimination based on race is of course prohibited regardless of a person's appearance. But a supervisor cannot discriminate against a person based on a characteristic of which the supervisor is unaware.

The attorney's mistake was perhaps understandable for another reason as well. Any factual account Ms. Burke gave the attorney of events at the Postal Service could not have included any reference to being American Indian. Even now, Ms. Burke has not suggested that anyone at the Postal Service ever mentioned her race or did or said anything suggesting bias against American Indians.

Ms. Burke also asserted in her complaint and amended complaint that she suffered retaliation for asserting she was the victim of racial discrimination.

II

When, as here, an employee relies on circumstantial evidence in support of a Title VII claim, the employee may proceed under the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later cases. Under that framework, an employee first must present a prima facie case. The employer then must proffer a legitimate, nondiscriminatory, nonretaliatory reason for its decision. The employee then must show that the proffered reason was not the real reason for the decision and that instead a reason was discrimination or retaliation. Alternatively, the employee may present other evidence from which a reasonable factfinder could infer prohibited discrimination or retaliation. *See, e.g.*, *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

III

When a plaintiff's discrimination claim addresses discipline short of termination, a prima facie case ordinarily consists of a showing that (1) the plaintiff is a member of a protected class, (2) the plaintiff was qualified for the job, (3) the plaintiff suffered an adverse employment action, and (4) the plaintiff was treated less favorably than a similarly situated person outside the protected class.

*See, e.g., Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

This formulation assumes, though, that the decision maker knew—or that there is at least evidence that would support a finding that the decision maker knew—that the plaintiff is a member of the protected class. In almost every case, the assumption is correct. Here, though, the assumption is incorrect. Nothing in this record would support a finding that at the times at issue, anyone involved in the disciplinary process knew or had reason to believe that Ms. Burke was American Indian. This, without more, is fatal to Ms. Burke's race claim.

To be sure, Ms. Burke testified that she told a supervisor on one occasion that she was American Indian. But Ms. Burke could not remember when this occurred. The record does not indicate whether the conversation occurred before or after the disciplinary actions at issue. The record gives no reason to believe any other Postal Service employee knew Ms. Burke was American Indian.

Ms. Burke has also failed to meet the fourth element of a prima facie case. She challenges discipline that was proposed or carried out for three express-mail errors and for leaving work without her supervisor's approval. The record includes no evidence that any other employee engaged in sufficiently similar conduct without being disciplined.

A prima facie case of retaliation consists of a showing that (1) the plaintiff engaged in statutorily protected activity, (2) the plaintiff suffered an adverse employment action, and (3) there is a causal connection between protected activity and the adverse action. *See, e.g.*, *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).

Ms. Burke has not established a prima facie case of retaliation because she has not shown a causal connection between protected activity and the discipline at issue, even under the circuit's liberal construction of that concept. *See, e.g.*, *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (stating that causation in this context means only that the protected activity and adverse action were not wholly unrelated).

Ms. Burke's race and retaliation claims fail for another reason as well: the Postal Service has shown a legitimate, nondiscriminatory, nonretaliatory reason for each of the three challenged disciplinary actions. As it turns out, some of the information on which the Postal Service relied was incorrect, but an error unrelated to race or retaliation does not establish a Title VII claim. *See, e.g.*, *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). This record would not support a finding that the proffered reasons for

Ms. Burke's discipline—even if erroneous—were a pretext *for racial discrimination* or *for retaliation for activity protected under Title VII*.

IV

A

Ms. Burke was subjected to repeated disciplinary actions. The first was a letter of warning on April 25, 2013, later reduced to an official discussion, for a missed delivery of express mail. Joint Ex. 1; Pl. Ex. 127c. Ms. Burke admits the charge was true. At the time of the charge, she had never claimed she was the victim of discrimination of any kind. Ms. Burke's assertion that her running dispute with management started with her much later complaint of racial discrimination is incorrect.

The next disciplinary action was a letter of warning for failing to work in a safe manner, resulting in an injury, on August 27, 2013. Joint Ex. 2. Ms. Burke did not challenge the letter of warning but says the reason is that she did not receive it. At the time of this discipline, Ms. Burke had never claimed she was the victim of discrimination of any kind. This again shows that Ms. Burke's attribution of all her problems to retaliation for her much later complaint of racial discrimination is incorrect.

Nearly constant disciplinary actions followed from that point forward. Some of the disciplinary actions were based on incorrect factual assertions. Some of the

Case 5:16-cv-00090-RH-GRJ   Document 88   Filed 02/06/17   Page 7 of 19
Page 7 of 19

incorrect assertions were corrected through processes available under the union contract. Some of the proposed discipline was abandoned; some was bargained down. There is no evidence that any of the disciplinary actions had anything to do with race or with retaliation for complaining about racial discrimination.

B

Three disciplinary actions survived summary judgment and thus were the subject of the trial. Each dealt with alleged mishandling of express mail, and one also charged Ms. Burke with leaving work without her supervisor's approval.

1

The first discipline at issue was imposed on November 21, 2014. Joint Ex. 8. The charge was late delivery of one express-mail item on September 27 and walking off the job on October 8. The late-delivery charge arose because Ms. Burke's code was entered for a late-delivered item.

When Ms. Burke was asked about the late delivery by her supervisor, Jennifer Lanier, on October 8, Ms. Burke became distraught and walked off the job, without Ms. Lanier's approval. When Ms. Lanier followed Ms. Burke into the parking lot, Ms. Burke admits she told Ms. Lanier, "Don't talk to me—I'm off the clock."

A later investigation showed that Ms. Burke's code was used on September 27 not only for the late-delivered item, but also for an item delivered two minutes

later and more than 20 minutes away. The most reasonable conclusion is that it was not Ms. Burke who made the late delivery. At the union representative's insistence, no discipline was upheld for the late delivery.

But discipline was upheld for walking off the job. Ms. Burke says she told Ms. Lanier she was leaving, but Ms. Burke does not assert Ms. Lanier *approved* her departure, and Ms. Burke admits she did not fill out the proper form requesting leave. Moreover, Ms. Burke admits making the remark in the parking lot—a remark that was rude, if not plainly insubordinate. The record includes no evidence that any other employee engaged in similar conduct without being disciplined.

2

The second discipline at issue was imposed on March 13, 2015, for improperly scanning 12 pieces of express mail on January 29, 2015. Joint Ex. 12. It is undisputed that the 12 pieces were improperly scanned as "en route" rather than "arrived at unit." And it apparently is undisputed that the items were scanned with Ms. Burke's code.

The improper scanning led to statistical entries adversely affecting the Panama City office's performance measures. The record includes no evidence that any Panama City employee was not disciplined when an error of this kind adversely affected the office's express-mail performance measures in this way.

But Ms. Burke says she did not do it. A jury could agree. Scanning express mail at that time of day was ordinarily the duty of Ms. Burke alone. A low-level supervisor, Eric Covington, assigned the nearest available employee to help Ms. Burke scan, because, he testified, the express-mail load was especially heavy that day. Mr. Covington programmed the other employee's scanner, and the other employee scanned items for 10 minutes or less, without changing the settings on the scanner. The other employee testified she could have scanned as few as 12 items—all large parcels. At least on this record, it seems as likely that the other employee's scanner was somehow improperly programmed by Mr. Covington at the outset as that Ms. Burke erroneously scanned 12 of the many items she scanned that day. A person could erroneously scan some but not all of her items only if her scanner's settings were changed midstream.

Even so, at least insofar as shown by this record, the information available to Ms. Burke's supervisor, still Ms. Lanier, was that Ms. Burke made the error. Ms. Burke's theory—that, as part of a conspiracy among Ms. Lanier and others in management, Mr. Covington unnecessarily brought in the other employee to help with coding and deliberately programmed that employee's scanner to support a bogus disciplinary action against Ms. Burke—is farfetched. And even if a jury could buy into the conspiracy theory, there is no evidence that the motivation for

Case No. 5:16cv90-RH/GRJ

the conspiracy was Ms. Burke's race or any unfounded charge of racial discrimination.

3

The third discipline at issue was imposed on September 26, 2015, based on an alleged improper delivery of one item of express mail to the wrong condominium on September 1. Pl. Ex. 94c; Joint Ex. 14. A low-level supervisor, Eric Smith, gave this testimony at trial. He received a call from a customer reporting that she had not received an item of express mail. The customer lived in unit 305 of a condominium building. Mr. Smith went to the building and spoke to a person who identified herself as a resident of unit 405. The person said she had received the item in error and wrote on the envelope that it was improperly received at 405, not 305. Mr. Smith worked at a different post office, did not know who had delivered the express mail, and did not know Ms. Burke.

Upon learning of the alleged error, Ms. Lanier initiated the discipline at issue. It was and is undisputed that Ms. Burke delivered this piece of express mail. But she denied delivering the mail to the wrong unit and challenged the proposed discipline through the process established under the union contract. A union representative located the actual resident of 405, who denied any role in this, leading to withdrawal of the discipline. The resident testified at the trial that 405 is her secondary residence, that on September 1 she was at home in her primary

residence in Alabama recovering from surgery, that she did not receive an express mail package in error on that date or any other, and that she did not make any such report to anyone from the Postal Service.

Ms. Burke asserts Mr. Smith was part of the grand conspiracy against her and fabricated the entire incident. This is again a farfetched theory. But even if a jury could buy into the conspiracy theory, there is no evidence that the motivation for the conspiracy was Ms. Burke's race or any unfounded charge of racial discrimination.

V

In sum, there is no evidence that race had anything to do with the disciplinary actions against Ms. Burke. There also is no evidence that the discipline was imposed in retaliation for activity protected under Title VII. To prevail on such a claim, a plaintiff must show that retaliation was a but-for cause of the contested action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013).

Title VII's retaliation provision consists of an "opposition clause" and a "participation clause." The Eleventh Circuit has described the clauses this way:

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3 (a). And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in

any manner in an investigation, proceeding, or hearing under this subchapter." *Id*.

*EEOC v. Total System Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

The participation clause protects an employee only for statements or acts that are part of the Title VII process—the filing and investigation of equal-employment charges. In most cases, charges are filed with the Equal Employment Opportunity Commission or a state counterpart, but charges against the Postal Service may be filed through the equal-employment process within the Postal Service itself. To be protected, the employee need not act in good faith; retaliation is forbidden even against an employee who willfully asserts a false charge. *Id*. at 1175; *see also Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1007 (5th Cir. 1969).

To invoke the opposition clause, in contrast, an employee must act in good faith. *See, e.g., Total Systems Servs.*, 221 F.3d at 1175 ("[T]his extreme level of protection for untruth is not afforded to false statements made under the opposition clause."); *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).

Ms. Burke had no good-faith basis for asserting she was a victim of racial discrimination. She thus cannot succeed on any claim under the opposition clause. She filed equal-employment charges, though most asserted only violations of the union contract and related labor claims having nothing to do with racial

discrimination. More importantly, the record includes not a word suggesting that retaliation was a factor in any disciplinary action against Ms. Burke. She says timing supports the retaliation claim, but the objective facts are to the contrary.

The long string of disciplinary actions against Ms. Burke began in April 2013, before she said a single word about discrimination. Ms. Burke sparred with management from that point forward.

In August 2013, Ms. Burke began asking to meet with the union steward on company time, apparently to address alleged violations of the union contract on the assignment of overtime. Ms. Burke submitted an NLRB complaint in November 2013 and amended it in December 2013. As amended, the complaint alleged that the Postal Service had, on 42 occasions, "discriminated" against her in one of two ways: "by failing to schedule her for overtime when she is on the overtime desired list in order to discourage union activities or membership," and "by refusing to allow her to meet with a union steward in order to discourage union activities or membership." Pl. Ex. 92g. The complaints said not a word about race.

Also in December 2013, Ms. Burke made an informal equal-employment complaint within the Postal Service, but again she said not a word about race. Pl. Ex. 92c. Instead, she complained the she had suffered retaliation—the denial of overtime—for submitting her labor complaint. *Id*. Ms. Burke identified three employees who allegedly received preferential treatment in the assignment of

overtime—one man and two women—and did not list their races. This was not a charge of racial discrimination, and no reasonable employer would understand this as a charge of racial discrimination.

Ms. Burke's complaints against management continued from that point forward. She filed dozens of grievances and estimated she spent 9,000 hours working on her grievances and other filings. All focused on alleged violations of the union contract. That Ms. Burke believes a complaint about union activity or violations of the union contract can be pursued through the equal-employment process, or that such a complaint is protected by the Title VII retaliation provision, does not make it so.

To be sure, Ms. Burke eventually filed an equal-employment charge that asserted discrimination based on race. This occurred in July 2015—after two of the three disciplinary actions at issue. Ms. Burke says this was a cause of the third disciplinary action. But the record shows that Ms. Burke's running dispute with management predated the July 2015 charge by two years. At trial, she said everything got worse in December 2013, but there was no evidence that anything changed in July 2015. Temporal proximity sometimes supports an inference of causation. But no reasonable inference can be drawn that Ms. Burke's July 2015 charge of racial discrimination was a cause of treatment in September 2015 that was a continuation of a dispute with management dating back more than two years.

This conclusion has been reached independently of, but is further supported by, Ms. Burke's own description of the cause of her travails, as set out in the July 2015 charge of discrimination. Ms. Burke wrote:

> No employee should have to endure this much pain, suffering, retaliation and adverse employment action against them just because they threatened to file a charge for not being allowed to see their union steward after requesting 26 to 27 times to a supervisor over a (3) month period and then be subjected to discriminatory acts of retaliation by management since that date (11/18/13 filed NLRB case #15-CA-120247 and #15-CA-116779).

Pl. Ex. 94a9 at 30. By Ms. Burke's own account, she suffered discrimination for union activity—not for activity protected by Title VII.

## VI

The analysis to this point shows that judgment as a matter of law was properly granted on the claims on trial: the claims that three specific disciplinary actions were motivated by race or taken in retaliation for activity protected under Title VII. A further word is in order about express-mail handling by other employees.

One of Ms. Burke's own witnesses, when asked about express-mail errors, said he had one express-mail failure and was disciplined for it—thus confirming, not calling into question, the defendant's assertion that express mail is a premium product for which proper and timely handling is essential and errors are taken seriously.

To be sure, not all express-mail errors resulted in discipline. No discipline was imposed on a carrier who received an item at the station too late to get to the destination by the deadline. No discipline was imposed on a carrier who relied on a Google Maps entry that turned out to be wrong. No discipline was imposed on a carrier whose retirement was imminent and who delivered an express-mail item one minute late. No discipline was imposed on a carrier who improperly scanned items but immediately caught and corrected the error. No discipline was imposed on a carrier whose supervisor caught an error and, at least insofar as this record shows, corrected the error before it affected any customer or the office's performance statistics.

Deciding whether the same discipline should be imposed in these differing circumstances is a management prerogative. *See, e.g.*, *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (stating that for an inference of discrimination to be permissible based on differential treatment of another employee, the "comparator must be similarly situated 'in all relevant respects' ") (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)); *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (stating that a comparator's conduct must "be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges").

Ms. Burke has not shown that anyone who was similarly situated in all relevant respects was not disciplined as she was.

VII

Additional comments are in order about Ms. Burke's claims and evidence.

Ms. Burke complains that she was required to "work the window"—waiting on customers—when she should have been handling express mail, the primary task of the position she had bid on and been awarded under the union contract. Even if true, this would not be an actionable adverse employment action. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (defining an "adverse employment action" in a retaliation case as an action that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination' ") (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). In any event, assigning Ms. Burke to work the window was a management prerogative or union-contract issue having nothing to do with race or retaliation.

Ms. Burke asserts she was denied overtime. In response to the defendant's summary-judgment motion, Ms. Burke abandoned any claim in this lawsuit that overtime was denied based on race or in retaliation for complaints about racial discrimination. Abandoning any such claim made sense. Even at the trial, Ms. Burke asserted only that one individual received preference for overtime over all others, in violation of the union contract. Neither violating a union contract nor

mistreating all comers is a Title VII violation. And any claim that overtime was denied in retaliation for complaints of racial discrimination would not withstand analysis. Ms. Burke's very first complaints—the complaints in November and December 2013 alleging only violations of the union contract and retaliation for union activity—asserted improper denial of overtime. The denial of overtime triggered the complaints, not the other way around. And as set out above, those complaints did not assert racial discrimination.

Finally, a constant theme of Ms. Burke's presentation was management's general mistreatment of employees. These apparently were harsh managers who were disliked by many employees. One of Ms. Burke's witnesses said she transferred out of Panama City because of the atmosphere. Another of Ms. Burke's witnesses, when asked about Ms. Burke being called out over the public-address system, said that happened to everyone. When asked whether she had seen Ms. Burke crying in the office, the witness said, "We've all done it." None of this is actionable under Title VII. *See, e.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (noting that a federal court does not sit as a super-personnel department).

## VIII

Throughout the trial, Ms. Burke presented evidence of mismanagement of the Postal Service facilities in Panama City, of alleged violations of the union

contract, of management's alleged mistreatment of Ms. Burke (and others), and of Ms. Burke's efforts to push back. None of it had anything at all to do with race. And none of it had anything to do with her late-in-the-day, unsupported allegation of racial discrimination. This was a union grievance masquerading as a Title VII case.

For these reasons,

IT IS ORDERED:

1. The clerk must enter judgment stating, "This action was resolved on a motion for summary judgment and on a motion for judgment as a matter of law during a jury trial. It is ordered that the plaintiff Stacy Burke recover nothing on her claims against the defendant Postmaster General in her official capacity. The claims are dismissed on the merits."

2. The case style is amended to correct the spelling of the plaintiff's name and the defendant's title, as set out in the case style of this order.

SO ORDERED on February 6, 2017.

                                                s/Robert L. Hinkle
                                                United States District Judge